Jeep Corporation, Appellee, v. Limbach, Tax Commr., Appellant.

[Cite as Jeep Corp. v. Limbach (1989), 47 Ohio St. 3d 67.]

(No. 88-879—Submitted October 10, 1989—Decided December 13, 1989.)

*Carlile, Patchen, Murphy & Allison* and *Robert J. Kosydar,* for appellee.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Richard C. Farrin,* for appellant.

*Per Curiam.* R.C. 5739.01(E)(2) excepts from the sales tax purchases in which the purpose of the consumer is "* * * to use or consume the thing transferred directly in the production of tangible personal property * * * for sale by manufacturing [or] processing * * *." R.C. 5741.02(C)(2) provides the same exemption from the use tax.

The commissioner argues that the BTA did not address the fuel feedback equipment in its decision, and she is unsure that the BTA excepted it. Reading the BTA decision as a whole, we conclude that the BTA did exempt the fuel feedback equipment. Moreover, the commissioner maintains that if the BTA did except it, the BTA erred because Jeep used the equipment after manufacturing had ended. Jeep responds that further manufacturing occurred after it used the equipment and that the equipment should be excepted.

The BTA had sufficient evidence before it to find that the fuel feedback equipment was excepted from the tax. The record included testimony that this test occurred after most of the final inspection line adjustments had taken place, but before the end of the line. The record also included testimony that adjustments continued until the end of this line. We will not overrule the BTA's factual finding that all equipment on the final inspection line, including the fuel feedback equipment, is excepted from tax. *Hawthorn Mellody* v. *Lindley* (1981), 65 Ohio St. 2d 47, 19 O.O. 3d 234, 417 N.E. 2d 1257, syllabus.

As to the paint storage tanks, the commissioner argues that the tanks stored raw materials prior to their consumption in manufacturing and that the tanks are taxable.

The definition of "manufacturing" in R.C. 5739.01(S) (now redefined in [R]), during the audit period, included "adjuncts" within its scope. In *Canton Malleable Iron Co.* v. *Porterfield* (1972), 30 Ohio St. 2d 163, 59 O.O. 2d 178, 283 N.E. 2d 434, syllabus, we stated:

"In order to obtain an exception from the sales tax pursuant to R.C. 5739.01(S), a claimant must show that the thing for which the exception is sought is an 'adjunct' used in production to complete a product at the same location and after transformation or conversion has commenced, and, pursuant to R.C. 5739.01(E)(2), must also show that the thing is an adjunct to direct use or consumption in production for sale."

Recently, in *Bird & Son, Inc.* v. *Limbach* (1989), 45 Ohio St. 3d 76, 543 N.E. 2d 1161, we held that machine bins, which held an immediate supply of granules for a blender box that was used directly in manufacturing roof shingles, were adjuncts to the blender box and excepted. In paragraph two of the syllabus, we stated:

"Equipment utilized to provide an immediate supply of raw materials to machinery employed directly in the production of tangible personal property is an adjunct used during and in the production of a product and necessary to carry on and continue that production. Such equipment is therefore subject to exemption from sales and use taxation pursuant to former R.C. 5739.01(S)."

In the instant case, we hold that the paint tanks provided an immediate supply of raw material to machinery that was used directly in manufacturing, and, thus, we except them. As for the primer tank, Jeep planned to draw the paint from it and apply the paint directly to the vehicle. As for the solvent tank, Jeep drew the solvent directly from it and mixed the solvent with the virgin paint in a mixer tank, and then applied the mixture to the vehicle.

Moreover, the commissioner does not dispute that the primer paint, top-coat paint and solvent, or any other paint room equipment, was used or consumed directly in production. Furthermore, the cases which she cites, *Standard Oil Co.* v. *Peck* (1955), 163 Ohio St. 63, 56 O.O. 56, 125 N.E. 2d 342, and *Southwestern Portland Cement Co.* v. *Lindley* (1981), 67 Ohio St. 2d 417, 21 O.O. 3d 261, 424 N.E. 2d 304, dealt with the storage of materials before manufacturing began. The instant case, consistent with *Bird & Son,* involves materials that are applied to an in-process product. Thus, processing has commenced, and we may appropriately review the tanks under the adjunct language.

Finally, the commissioner argues that we should reverse the BTA because it applied the primary use test to the fungible raw materials incorporated into the tested vehicles. According to the commissioner, we once authorized the primary use test for fungibles in *Richardson-Merrell* v. *Porterfield* (1973), 32 Ohio St. 2d 281, 61 O.O. 2d 501, 291 N.E. 2d 528, but have since withdrawn this authorization in *B.F. Goodrich Co.* v. *Lindley* (1979), 58 Ohio St. 2d 364, 12 O.O. 3d 325, 390 N.E. 2d 330. The commissioner asserts that, under *Goodrich,* the portion of the raw materials that Jeep incorporated into vehicles for sale should be exempt, but the portion that Jeep incorporated into vehicles for testing should be taxed.

R.C. 5739.01(E)(2), in addition to excepting items used directly in manufacturing, excepts purchases in which the consumer's purpose is "[t]o incorporate the thing transferred as a material or a part, into tangible per-

sonal property to be produced for sale by manufacturing, assembling, [or] processing * * *."

In *Richardson-Merrell,* the taxpayer incorporated raw materials into finished drugs for sale. However, the taxpayer incorporated eight percent of the raw materials into drugs that it gave free to doctors and hospitals as samples. We applied the primary use test to the fungible raw materials, held that the primary use of the raw materials was for manufacturing, and excepted all the raw materials.

In *Goodrich,* the taxpayer purchased coal and fuel oil which it consumed to generate steam for excepted manufacturing uses and for taxable uses. The BTA, applying the primary use test authorized in *Richardson-Merrell,* exempted all the coal and oil. We held that the BTA finding violated the statutory scheme, which makes the consumer's purpose the basis for the exemption claim. We stated that the extension of the primary use test to fungibles had been unnecessary in *Richardson-Merrell.* Moreover, according to the opinion, R.C. 5739.031 permits a consumer to obtain a direct pay permit if the purchaser could not determine the actual use of the item at the time of purchase. Under the direct pay permit procedures, the consumer pays the tax upon an agreed portion of its purchases, and the remainder is exempt. Therefore, apportionment, rather than the primary use test, was appropriate. But R.C. 5739.031, by its terms,[2] pertains to the direct use provisions of R.C. Chapter 5739, not to the incorporation exception considered in *Richardson-Merrell* and here.

Furthermore, we conclude that the primary use test, like the direct pay procedure, does not apply to the incorporation exception. We adopted this test for the situation when a manufacturer purchases a machine, uses it in a function which would render it exempt and a function which would render it taxable, and seeks exemption. Under the test, the machine's primary use, quantitatively and qualitatively, determines its taxability. *Ace Steel Baling* v. *Porterfield* (1969), 19 Ohio St. 2d 137, 48 O.O. 2d 169, 249 N.E. 2d 892, paragraph two of the syllabus. As expressed in Justice Paul Brown's dissent in *United States Shoe Corp.* v. *Kosydar* (1975), 41 Ohio St. 2d 68, 74, 70 O.O. 2d 159, 163, 322 N.E. 2d 668, 673, the test was never meant for the incorporation exception and inaptly applies to it. In that case and here, the only purpose for purchasing the raw materials was to incorporate them into manufactured products for sale. Thus, the primary use test, created for another exception, cannot apply here.

Nevertheless, in *Goodrich,* we explained that the result in *Richardson-Merrell* had been correct despite the erroneous extension of the primary use test. According to *Goodrich,* the portion of the raw materials incorporated by Richardson-Merrell into the product and given free as a sample was incidental and complementary to the excepted purpose and did not detract from the credibility of that purpose. Furthermore, the evidence did not destroy the

---

[2] R.C. 5739.031, in pertinent part, provides:

"The tax commissioner may authorize a manufacturer or other consumer, who purchases tangible personal property under circumstances which normally make it impossible at the time of purchase to determine the manner in which it will be *used,* to pay the sales tax * * * or the use tax * * * directly to the state * * *." (Emphasis added.)

overall exempt purpose claimed. Thus, the taxpayer affirmatively established its right to exception. Under this analysis, the commissioner's argument still fails, even though the BTA erred when it applied the primary use test to Jeep.

Jeep crashed vehicles, into which it had incorporated some of the disputed raw materials, in conducting federally regulated tests to obtain federal certification and, in conducting other tests, to ensure that already certified vehicles still met federal standards. Jeep delivered other vehicles, into which it had incorporated the rest of the disputed raw materials, to an engineering department of its parent corporation for testing for development and research.

We believe that both testing functions necessarily enhanced Jeep's production. The crashed vehicles assisted Jeep in obtaining and maintaining federal certification so that it could sell the remainder of its products. The engineer-tested vehicles assisted Jeep in improving its vehicles so that it could produce a better and, presumably, more marketable vehicle. Thus, this testing complemented and, in fact, augmented Jeep's production.

In the final analysis, Jeep's purpose when it purchased the raw materials was to incorporate them into final products and then sell the products. Jeep never changed this purpose, despite testing the products made from the contested raw materials and, ultimately, destroying or devaluing them. The motivating force that induced Jeep to purchase these raw materials was to manufacture products for sale. Furthermore, testing randomly selected vehicles did not detract from this purpose but, instead, bolstered Jeep's production by revealing the quality and limitations of its manufactured products. For these reasons, Jeep may claim exception for these raw materials under the incorporation exception of R.C. 5739.01 (E)(2).

Consequently, the BTA's decision is reasonable and lawful, and we affirm it.

*Decision affirmed.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WRIGHT, H. BROWN and RESNICK, JJ., concur.